UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLY REEVES,

     Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.

Case No. 2:13-cv-14271
Honorable Laurie J. Michelson
Magistrate Judge David R. Grand

---

**OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [16] AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [21]**

---

Plaintiff Kelly Reeves suffers from post-traumatic stress disorder and anxiety. Reeves believes that these conditions (and certain physical limitations) prevent her from working full time. So, in 2010, she applied for supplemental security income under Title XVI of the Social Security Act. In June 2012, an administrative law judge acting on behalf of the Social Security Administration concluded that Reeves was not disabled. Leave for further administrative process was denied, making the ALJ's decision Defendant Commissioner of Social Security's final decision on disability. Reeves appealed her case here, asserting that the Commissioner's disability determination was error. Reeves and the Commissioner then filed cross motions for summary judgment. (Dkt. 16, Pl.'s Mot.; Dkt. 21, Def.'s Mot.)

Having reviewed the ALJ's opinion, the administrative record, and the summary-judgment briefs, the Court finds that Reeves has shown that the Commissioner's decision is procedurally flawed. The Court will thus GRANT Reeves' motion, DENY the Commissioner's, and REMAND this case for further administrative proceedings.

## I.

The nature of Reeves' appeal makes only certain portions of the administrative record relevant. She challenges the Commissioner's disability decision in three ways: (1) the ALJ erred in evaluating Dr. Welton Washington's opinion, (2) the ALJ erred in explaining her evaluation of Dr. Washington's opinion, and (3) the ALJ erred in explaining her evaluation of Dr. Christine Schloesser's opinion. (*See* Pl.'s Mot. at 8–15; *see generally* Dkt. 22, Pl.'s Reply.) Reeves' mental or emotional impairments are the bases of these two medical opinions and her arguments to this Court. (*See* Dkt. 10, Administrative Record ("Tr.") 246–49, Washington's Op.; Tr. 259, Schloesser Op.; Pl.'s Mot. at 8–15; Pl.'s Reply at 1–5.) Thus, although Reeves' disability application was premised in part on physical impairments (including a hernia and ankle swelling) (*see* Tr. 16), the following factual summary does not discuss physical impairments. Further, although Reeves was morbidly obese during the period in question (*see* Tr. 17), and obesity can affect mental functioning, *see* S.S.R. 02-1p, 2002 WL 34686281, at *6, Reeves' arguments on appeal do not rest on that impairment, (Pl.'s Mot. at 8–15; Pl.'s Reply at 1–5). Dr. Washington's opinion does not mention obesity, and Dr. Schloesser's opinion does not appear to rest primarily on that condition. (*See* Tr. 246–49, 259). So the following factual summary of the relevant medical evidence and testimony before the ALJ does not discuss obesity in detail.

## A.

In June 2008, Reeves saw a physician for a "hypothyroidism check." (Tr. 205.) The physician's assessment included, "Question history of panic attacks in a patient who states that she was on Xanax but has not been on this for two years." (Tr. 205.)

In April 2009, at a follow-up exam for her thyroid condition, Reeves reported anxiety and panic attacks after a friend's recent, sudden death. (Tr. 203.)

On July 7, 2010, Dr. Welton Washington, a psychiatrist (Tr. 19), completed a psychiatric evaluation of Reeves (Tr. 189–92). Reeves reported that some of her anxiety was related to a difficult upbringing, including that her mother had mental-health conditions and that her father neglected her emotionally. (Tr. 190.) Reeves also described experiencing a flood when she was 26 years old: she was stranded on a hill with her then husband and one-year-old child and witnessed several people drown. (*Id.*) Reeves described "experiencing nightmares, intrusive thoughts, intermittent heart palpitations and shortness of breath, and sometimes feelings of impending doom." (*Id.*) Reeves had treated with sertraline,[1] but, due to financial difficulties, stopped taking that medication four years earlier. (*Id.*) Reeves reported having had a physically and emotionally abusive relationship with her ex-husband; Dr. Washington noted, "She divorced 3 years ago but continues to describe anxiety related to this as well." (Tr. 190.) In the "Impressions" section of his report, Dr. Washington wrote:

> 46-year-old divorced woman with hypothyroidism and a history consistent with PTSD. Although this appears to have been more problematic in the past, it does not appear to be causing any functional limitation currently. She also has symptoms suggestive of social phobia but does not appear to have the avoidance behavior characteristic of this condition. She would likely benefit from [a selective serotonin reuptake inhibitor] as she appears to have done quite well with sertraline in the past. She would also likely benefit from talk therapy to address her history of abuse.

(Tr. 191.) Dr. Washington thought that Reeves' clinical status was "symptoms stable." (Tr. 191.)

---

[1] "Sertraline is used to treat depression, obsessive-compulsive disorder (bothersome thoughts that won't go away and the need to perform certain actions over and over), panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks), posttraumatic stress disorder (disturbing psychological symptoms that develop after a frightening experience), and social anxiety disorder (extreme fear of interacting with others or performing in front of others that interferes with normal life). . . . Sertraline is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs). It works by increasing the amounts of serotonin, a natural substance in the brain that helps maintain mental balance." MedlinePlus, *Sertraline*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html#why (last visited Mar. 3, 2015).

Even so, that same day, Dr. Washington wrote a "to whom it may concern" letter, stating: "Kelly Reeves . . . was evaluated by me . . . on July 7th, 2010. Her persistent anxiety symptoms would likely be worsened significantly by the stress of jury duty. Please excuse her from this responsibility." (Tr. 187.)

In October 2010, Reeves, along with her adult daughter Brittany, completed reports for the Social Security Administration describing Reeves' functioning. Reeves listed a number of daily activities, including housework, helping her grandchild get to school and with his homework, and using the computer to read articles. (Tr. 139.) She stated that she played cards and talked on the phone on a daily basis. (Tr. 143.) Reeves said that she could go to the grocery store and visit friends. (*Id.*) Still, Reeves reported significant limitations: that she could pay attention for only 20–30 minutes, that she had difficulty following instructions, that her memory was poor, and that she could not handle high-stress situations. (Tr. 144–45.) Brittany's report is similar: she provided that Reeves could play online games, help her grandchild with homework, visit with family, and do a "wordsearch," but needed to be told instructions several times, struggled with anxiety "very badly," and had "fr[eq]uent panic attacks." (Tr. 131–32, 135–37.)

On December 8, 2010, Dr. Christine Schloesser, a specialist in "family medicine" (Tr. 261), evaluated Reeves' thyroid condition. (Tr. 197.) Among her rather lengthy notes is the remark, "[Reeves] appears very anxious." (Tr. 197.)

In May and June 2011, Reeves and her daughter again completed function reports; the reports are similar to those from October 2010. Reeves provided that she would read, "sometimes run errands," and help her grandchild with homework on a daily basis (Tr. 161), but had difficulty with instructions, could only pay attention for "5 minutes or less" in "loud or busy" conditions, and would panic and feel dizzy under stress (Tr. 166–67). Brittany provided

4

that Reeves' daily activities included spending time with her family and on the internet, that Reeves would babysit her grandchild and help with homework (Tr. 150–51), but that Reeves did not handle stress well, had a "hard time with anxiety," and had "frequent panic attacks" (Tr. 156).

On July 5, 2011, Thomas Horner, Ph.D., a licensed psychologist, completed a mental-status evaluation of Reeves for Michigan's Disability Determination Services, a state agency that helps the Social Security Administration assess disability applicants. (Tr. 212–16.) Reeves was "tearful throughout [the exam] as the subject of her long and unhappy marriage recurred." (Tr. 212.) Reeves' discussion of her mother's death also "immediately drew tears." (*Id.*) As she had with Dr. Washington, Reeves recalled witnessing the deaths of friends in a flood. (Tr. 213.) Symptom-wise, Reeves reported waking two to three times per night due to worries and bad dreams and that she was depressed a lot. Reeves was able to perform a "Serial 7's" test with "minor computation error" and a "Serial 3's" test with "no" error, and she was "[a]ttentive with sustained effort" during the tests. (Tr. 215.) Dr. Horner described Reeves' "[a]ttention/concentration" as "[f]ocused and sustained" and her intelligence, "[n]ormal." (Tr. 215.) Dr. Horner diagnosed "[a]djustment disorder" and/or PTSD with associated ruminative depression. (Tr. 216.) He opined:

> Ms. Reeves's ability to relate to others . . . is intact. Her abilities to understand, remember and to carry out familiar tasks are essentially intact. Her ability to focus and sustain attention to relevant occupational tasks is basically intact and operational though affected by her moods to the extent that her concentration can be diminished. The efficiency of Ms. Reeves's ability, but not her ability as such, to withstand or otherwise cope with the stresses of ordinary occupational activity is affected by her moods. Her current physical health—particularly, it would seem, her abdominal condition—poses an interference to her physical capacities for work.

(Tr. 216 (emphases removed).)

About three weeks later, on July 25, 2011, Darrell Snyder, Ph.D., completed a Psychiatric Review Technique and Mental Residual Functional Capacity forms following a review of Reeves' medical file. (Tr. 222–36.) Dr. Snyder thought that "[t]he disability specialist," apparently Dr. Horner, "provided an excellent summary of [the medical evidence of record]." (Tr. 232.) He gave "[s]ome weight to [Reeves' treating source] due to clinical observations and treatment over time" but assigned "primary weight" to Dr. Horner's evaluation "due to comprehensiveness and recency of contact." (Tr. 232.) Regarding Reeves' residual functional capacity, Dr. Snyder opined,

> The claimant can understand, remember and follow instructions involving content that is basic and straightforward but not moderately complex.
>
> She can sustain routine and repetitive tasks but would falter on more detailed or complex tasks.
>
> She could tolerate average contact with the peers and supervisors and while somewhat more anxious with those unknown to her, she can still relate adequately with them.
>
> She is unable to adapt to enhanced work productivity such as fast paced or high production quota conditions.

(Tr. 236.)

On August 12, 2011, Reeves went to see Dr. Suzette LaVigne, apparently an internal-medicine or family-practice physician working in the same facility as Dr. Schloesser, for stress and anxiety. (Tr. 251–52.) Dr. LaVigne noted, "As I enter the room she has already been crying and has been crying for some time as best I can tell from swelling of her eye lids." (Tr. 251.) After Reeves spoke about her abusive husband and having nightmares since his death, Dr. LaVigne asked Dr. Washington to join the visit. (Tr. 251.) Reeves continued to discuss her husband; Dr. LaVigne wrote:

> He passed away in May in his own home. This was discovered several days after his death. She reports she found out his pit bull was actually eating him and she and her two children who had nothing to do with their father had to clean the home and go through the house.

(Tr. 251.) In a section of her notes titled "Review of Systems," Dr. LaVigne noted,

> [D]epressed mood. Poor sleep. Poor concentration. Nightmares. Poor appetite. Being sick to her stomach. Neck pain radiating into her shoulders. Patient does not have any suicidal ideation. She is currently not working. She had been collecting alimony. She had applied for disability on the basis of depression, PTSD as well as abdominal hernia and ankle pain. Apparently this was denied.

(Tr. 251.) Dr. LaVigne started Reeves on Pamelor and recommended counseling. (Tr. 251–52.)[2]

Dr. Washington also made notes of the visit. (Tr. 250.) He recounted that Reeves stated that in her dead husband's house, "[t]here was blood everywhere!" (Tr. 250.) He also noted, "Her mood is depressed and she has had frequent crying spells. Her sleep is poor with early and middle insomnia. Her concentration is limited. Intrusive memories of past traumatic events, such as physical abuse and being caught in a flood, have also worsened. No evidence of overt psychotic symptoms. She describes thoughts of death but denies any active suicidal or homicidal intent or plan." (Tr. 250.)

A week later, on August 19, 2011, Reeves saw Dr. Schloesser who was joined by Kate Tenpenny, a psychologist. (Tr. 253.) Reeves reported not noticing any improvement in her mood from Pamelor. (Tr. 253.) "She continues to have nightmares and tearfulness every day. She does not feel like she has many people to talk to. Her children are somewhat supportive, but as she puts it, they are involved in their own lives[.]" (Tr. 253.) Reeves reported having passive suicidal thoughts and difficulty sleeping. (Tr. 253.) Dr. Schloesser thought that Reeves was in need of

---

[2] Nortriptyline (brand name Pamelor) "is used to treat depression. Nortriptyline is in a group of medications called tricyclic antidepressants. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance." MedlinePlus, *Nortriptyline*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682620.html#why (last visited Mar. 10, 2015).

"prolonged counseling" and planned to see Reeves in two weeks to follow up on her medication. (Tr. 253.) Dr. Schloesser provided, "[a]t this point, we will only get Dr. Washington involved again if the current regimen is not working or if Kate [Tenpenny] sees the need at her visits." (Tr. 253.)

Reeves had an appointment with Tenpenny on October 4, 2011. (Tr. 255.) Reeves presented with an anxious mood and asked if it was ok to "pace in the office." (Tr. 255.) Reeves reported, "I can't do anything because of my pain, which makes my depression worse and now I'm not sleeping either, sometimes it doesn't feel worth to live." (Tr. 255.) Tenpenny consulted with Drs. Washington and Schloesser about Reeves' "current increase in symptom manifestation with the resulting plan being to re-initiate . . . Pamelor at a higher dose[.]" (Tr. 255.)

On October 5, 2011, Dr. Washington completed a "Psychiatric/Psychological Examination Report" and a "Mental Residual Functional Capacity Assessment" for the Michigan Department of Human Services (collectively, "Dr. Washington's opinion"). (Tr. 246–49 (Ex. 10F before the ALJ).) He noted that he had last seen Reeves in August. (Tr. 249.) He further wrote that Reeves' symptoms "consistent with PTSD" have "worsened with the death of her ex-husband." (Tr. 246.) Dr. Washington informed the State that Reeves had "no difficulty" maintaining "basic" activities of daily living, but "more complex ADL's[,] such as bill payment [might] be more difficult at present given difficulty with attention but this should improve with treatment." (Tr. 247.) On a scale ranging from "not significantly limited" to "moderately limited" to "markedly limited," Dr. Washington provided that Reeves was "markedly limited" in her ability "to maintain attention and concentration for extended periods" and "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr.

8

248.) He also provided that Reeves had "moderate" limitations in other areas of mental functioning. (*See id.*)

The next day, October 6, 2011, Reeves had an appointment with Dr. Schloesser. (Tr. 262–63.) Reeves had stopped taking Pamelor as she could not afford the $4 co-pay. (Tr. 262.) Dr. Schloesser noted that the medication seemed to be helping "a little bit," but Reeves still felt depressed, had crying episodes most days, and "some passive suicidality." (Tr. 262.) Reeves also reported that she had been invited to go walking but could not because of joint pain. (*Id.*) "She says she hates the way that she looks and how she feels. She went to Cedar Point recently and could not ride any of the rides because she is obese and felt humiliated." (*Id.*) Reeves was "tearful throughout the interview when talking about her stressors." (*Id.*) Although Dr. Washington wanted to increase Reeves' Pamelor prescription, Dr. Schloesser was "hesitant" given Reeves' passive suicidality. (*Id.*) She thus initiated Prozac (fluoxetine) and prescribed Trazadone as a sleep aid. (*Id.*) Dr. Schloesser "strongly" encouraged Reeves "to go to Catholic Social Services to establish counseling and see a psychiatrist." (*Id.*) Reeves had missed her prior appointment at Catholic Social Services due to oversleeping. (*Id.*)

Reeves saw Rebecca Cummings, an intern completing her masters in social work, at Catholic Social Services between November 10, 2011, and January 26, 2012. (Tr. 267.) At their first session, Reeves reported having nightmares since her husband's death; when Cummings asked why the nightmares had "started up again," Reeves responded, "Because when we were married he was abusive to me both physical and mentally." (Tr. 276.) On January 26, 2012, Cummings wrote, "[client] really has sho[wn] very little progress in any of the goals that [client] set for herself. The problem is lack of transportation, even public transportation is out of the question[] simply because of where she resides. I do feel that if [client] had reliable

9

transportation she would be progressing and meeting her goals." (Tr. 280.) In a summary letter, Cummings wrote, "Due to transportation problems Ms. Reeves was only able to attend 4 out of 7 sessions, which has left Ms. Reeve[]s significantly impaired in the area of Social and Emotional functioning. Because of her impairments this has left Ms. Reeve[]s unable to seek and maintain regular employment." (Tr. 267.)

Reeves returned for a follow-up with Dr. Schloesser on January 10, 2012. (Tr. 264.) Reeves reported that she thought that Fluoxetine had made her feel more depressed. (*Id.*) Dr. Schloesser's assessment included, "Depression. This continues to be uncontrolled. Unfortunately, Kelly has not improved with Prozac or Amitriptyline. At this point, she is established with Catholic Social Services, so we will hold off on any more drug trials and wait until she is evaluated by their psychiatrist." (*Id.*)

At the end of January 2012, Dr. Schloesser completed "Medical Needs" and "Medical Examination Report" forms for the Michigan Department of Human Services (collectively, "Dr. Schloesser's opinion"). (Tr. 259–61.) She provided that Reeves' diagnoses were PTSD and depression and that she had limitations in memory, sustained concentration, and social interaction. (Tr. 259, 261.) When asked "Can patient work at any job?" Dr. Schloesser checked the box indicating "No." (Tr. 259.) She added that she was "uncertain" as to how long Reeves would be unable to work. (Tr. 259.)

In March 2012, Dr. LaVigne, although primarily opining on Reeves' physical functioning, noted that Reeves' "severe mental illness further interfere[d] with [her] ability to work." (Tr. 266.)

In April 2012, Reeves had a medication review appointment with Dr. Washington. (Tr. 284–87.) The psychiatrist wrote, "[Reeves'] mood remains depressed and she has had frequent

crying spells. Of note, she has discontinued Elavil as 'I didn't like how it was making me feel.' Her sleep is poor with early and middle insomnia. She takes trazodone very infrequently as she believes it causes her to sleep walk. Her concentration is limited. . . . She remains somewhat hypervigilant when in social situations, such as the grocery store." (Tr. 284.)

## B.

Following the Social Security Administration's initial denial of Reeves' application for supplemental security income, Reeves sought review by an administrative law judge. On May 4, 2012, Reeves appeared and testified before Administrative Law Judge Martha Gasparovich ("the ALJ"). (Tr. 30.)

The ALJ asked Reeves to describe how her anxiety and depression affected her or prevented her from going to work. (Tr. 36.) Reeves answered,

> I don't—I don't like to drive. I get really panicked, and stressed in activity, a lot of activity around me. I have some issues with people being upset around me from the abuse that I went through for most of my twenty-five years I was married especially if it is a male upset at me. I have issues with my stomach that sometimes I have chronic diarrhea, which is usually brought on worse from the stress, and sometimes it makes me sick for a day or so.

(Tr. 36.) Reeves further explained that her concentration affected her ability to work: "like I don't have any concentration. When I—I said I was trying to learn my way around the computer, and the kids repeat, and repeat, and repeat. It's hard to—it takes me a long time to get something." (Tr. 37.) Reeves explained that since her ex-husband died, her symptoms had been "really, really bad." (Tr. 37.) Regarding her condition at the time she first applied for disability benefits, in May 2010, Reeves testified, "My stomach, my ankle, and the depression, and the anxiety was not as bad as it is now. It was still bad but . . . not as bad as it is since then." (Tr. 41.)

Reeves' counsel asked Reeves about the function report Reeves had completed in 2010:

Q. . . . This is [Exhibit] 4E. A long list of activities that you did in a given day, in a typical day. Do you see that right here? It looks pretty active.

A Well —

Q Is that what you were doing back then?

A Tyler (PHONETIC) is going to be thirteen. I just —

Q Tyler is your grandson?

A — tried to put some stuff in there so it didn't look so stupid.

(Tr. 41.) Reeves then went on to testify about some of her function-report responses, including that her use of the computer was limited to looking "at the front page on Yahoo," that she would make a bowl of cereal in the morning, that her daughter (then 18 years old) would sometimes accompany her on shopping trips, and that, maybe six times per month she would fall asleep in the afternoon and keep sleeping "until the next day." (Tr. 41–43, 47.)

Following Reeves' testimony, the ALJ asked a vocational expert to testify about job availability for hypothetical individuals with limitations similar to Reeves'. In particular, the ALJ asked the vocational expert to consider an individual with a  number of physical limitations, who was mentally or emotionally limited to "simple routine, one to three step tasks in a low stress environment defined as no quick decision-making, and no quick judgment required on the job," and who could only work in a "non-production pace setting." (Tr. 49–50.) The expert testified that "[a]n individual with these limitations could be a "cutter and paster of press clippings," an "addressing clerk," or a "final assembler of optical equipment." (Tr. 50.) The vocational expert thought that there were thousands of these jobs in Michigan. (*Id.*)

12

### C.

On June 21, 2012, the ALJ found that Reeves had "not been under a disability, as defined in the Social Security Act, since September 24, 2010, the date the application was filed[,]" through June 21, 2012. (Tr. 25.) In particular, the ALJ assigned "some weight" to the opinion of Dr. Schloesser, "significant weight" to the opinion of the consultative examiner Dr. Horner, and "some weight" to the opinion of the file-review physician, Dr. Snyder. (Tr. 22–24.) As for Dr. Washington, the ALJ concluded, "to the extent consistent with the findings as stated in this decision, I have assigned significant weight to the opinion of Dr. Washington[.]" (Tr. 22.) Those findings included the ALJ's assessment of what Reeves could still do despite her mental and emotional impairments: performing simple, routine, one to three-step tasks in a low-stress ("defined as no quick decision making and no quick judgment on the job"), non-production-pace, and no-public-interaction work setting. (Tr. 18.) As the ALJ's residual functional capacity assessment of Reeves matched the functional capacity of one of the hypothetical individuals that the vocational expert said could work as a cutter and paster of press clippings (for example), the ALJ concluded that "there are jobs that exist in the significant numbers in the national economy that the claimant can perform." (*See* Tr. 24.)

Reeves asked the Social Security Administration's Appeals Council to review the ALJ's decision, but, on September 6, 2013, the Appeal Council denied Reeves' request. (Tr. 1.) As such, the ALJ's decision became the final decision of the Commissioner of Social Security.

On October 8, 2013, Reeves filed suit here, challenging the Commissioner's final disability determination. (Tr. 1.)

Both parties have filed motions for summary-judgment, the Commissioner asking this Court to affirm the ALJ's decision (*see generally* Dkt. 21, Def.'s Mot. Summ. J.), Reeves asking

this Court to remand the case for further administrative proceedings (*see generally* Dkt. 16, Pl.'s Mot. Summ. J.).

## II.

This Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). But judicial review is limited: the Court "must affirm the Commissioners conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

## III.

### A.

Reeves says that the ALJ made three errors—all stemming from the ALJ's application of 20 C.F.R. § 416.927(c) and S.S.R. 96-2p, or, in social security parlance, the "treating-source rule."

Under the treating-source rule, "[a]n ALJ must give the opinion of a treating source controlling weight if [s]he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former 20 C.F.R. § 404.1527(d)(2) now § 404.1527(c)(2)); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). And where an ALJ finds that a treating physician's opinion is not entitled to "controlling weight," there remains a rebuttable presumption that the opinion is entitled to "great deference." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4.

14

Related to this last point is the explanatory aspect of the treating-source rule: when an ALJ assigns a treating-source opinion less than controlling weight, she must provide "good reasons," supported by substantial evidence, for the weight she assigns the opinion. *See Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544. And in providing "good reasons," an ALJ should consider the following factors: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the supportability of the treating-source opinion, (4) the "consistency of the opinion with the record as a whole," (5) "the specialization of the treating source," and (6) any other factors "which tend to support or contradict the opinion." 20 C.F.R. § 416.927(c); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (suggesting that an ALJ must consider all the factors in § 416.927(c) but need not explain each in the disability decision). The claimant's procedural right to an adequate explanation of her treating physician's opinions is substantial: abridgement typically warrants remand even if substantial evidence supports the ALJ's disability determination. *See Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

As to Dr. Washington, Reeves invokes both the substantive and procedural aspects of the treating-source rule. (Pl.'s Mot. at 9–13.) She asserts that the ALJ failed to adequately explain how she assessed Dr. Washington's opinion (*id.* at 9–11) and, moreover, that substantial evidence does not support the ALJ's assignment of less than controlling weight to Dr. Washington's opinion (*id.* at 11–13). Regarding Dr. Schloesser's opinion, Reeves asserts that the ALJ's explanation for assigning the family physician's opinion "some weight" failed to comply with the procedural aspect of the treating-source rule. (*See* Pl.'s Mot. at 13–15.) The Court begins with the adequacy of the ALJ's explanation for the weight she assigned to Dr.

Washington's opinion. The question is close but the Court finds that the ALJ did not adequately

explain how she assessed that opinion.

## B.

In weighing Dr. Washington's opinion the ALJ provided that although the treating

psychiatrist "found some moderate to marked limitations in the claimant's ability to sustain

concentration and persistence, maintain social interaction, and with regard to adaptation (Ex

10F)," he also

> reported no evidence of limitations, or no significant limitations, with regard to
> the claimant's ability to perform simple, one to two-step instructions, sustain an
> ordinary routine without supervision, work in coordination with or proximity to
> others without being distracted by them, make simple work-related decisions,
> maintain socially appropriate behavior and to adhere to basic standards of
> neatness and cleanliness, interact with the general public or supervisors, respond
> appropriately to changes in the work setting, and to be aware of normal hazards
> and take appropriate precautions. (Ex 10F).

(Tr. 22.) The ALJ then stated, "While noting minimal evidence of treatment from July 2010

through August 2011, I find such opinion to be generally supported by the medical evidence,

revealing symptoms of depression and anxiety, however noting no difficulty maintaining basic

activities of daily living, good insight and judgment, and appropriate behavior (Ex 10F)." (Tr.

22.) "Accordingly," the ALJ concluded, "to the extent consistent with the findings as stated in

this decision, I have assigned significant weight to the opinion of Dr. Washington[.]" (Tr. 22.)

This analysis of Dr. Washington's opinion does not adequately explain why certain

potentially-work-preclusive limitations provided by Dr. Washington were rejected. *See Wilson*,

378 F.3d at 544 (providing that one of the reasons for the explanatory aspect of the treating-

source rule is "to let claimants understand the disposition of their cases, particularly in situations

where a claimant knows that his physician has deemed him disabled and therefore might be

especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied"); *see also* S.S.R. 96–2p, 1996 WL 374188, at *4–5. As Reeves points out on appeal to this Court (Pl.'s Mot. at 10), Dr. Washington found that she was "markedly limited"—the most extreme rating available on the form that Dr. Washington completed—in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 248.) The Court agrees with Reeves that the ALJ's apparent rejection of Dr. Washington's "marked" rating in this category could be "significant" as it relates to Reeves' ability to work without "excessive breaks, absences, [or] reduction in productivity[.]" (*See* Pl.'s Mot. at 10.) Yet the ALJ apparently rejected this limitation while accepting the less severe limitations that Dr. Washington provided. The only explicitly-stated reason was that Reeves had "no difficulty maintaining basic activities of daily living, good insight and judgment, and appropriate behavior." But this is not inconsistent with being unable to work a 40-hour week "without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("[T]he ALJ emphasized that Rogers is 'fairly active' by noting that she is still able to drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news, '[d]espite her numerous complaints.' Yet these somewhat minimal daily functions are not comparable to typical work activities."); S.S.R. 96-8p 1996 WL 374184, at *1 ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

The ALJ's minimal explanation for rejecting Dr. Washington's most severe limitations is especially problematic in view of Reeves' condition after July 2011. Although the Court largely agrees with the ALJ's finding of "minimal evidence of treatment from July 2010 through August 2011," it is clear that beginning in August 2011, Reeves' symptoms worsened. On August 12, 2011, Dr. Washington wrote, "[Reeves'] mood is depressed and she has had frequent crying spells. Her sleep is poor with early and middle insomnia. Her concentration is limited. Intrusive memories of past traumatic events, such as physical abuse and being caught in a flood, have *also worsened*." (Tr. 250 (emphasis added).) And on August 19, 2011, Dr. Schloesser noted passive suicidal thoughts—a symptom that was not noted by Dr. Washington in July 2010 (*see* Tr. 189–92) or Dr. Schloesser in December 2010 (*see* Tr. 197). On October 4, 2011, Tenpenny consulted with Drs. Washington and Schloesser about Reeves' "current *increase* in symptom manifestation with the resulting plan being to re-initiate . . . Pamelor at a higher dose[.]" (Tr. 255 (emphasis added).) All of this happened before Dr. Washington's October 5, 2011 opinion.[3]

Thus, the ALJ's specific explanation for partially adopting Dr. Washington's opinion—especially in view of Reeves' condition after July 2011—is unclear to the Court, and, presumptively, Reeves.

And this conclusion holds even as the Court broadens its focus from the single paragraph directly addressing Dr. Washington's opinion to the ALJ's entire narrative. On the whole, it appears that the ALJ found the following most significant in making her disability determination: (1) that Reeves (and her daughter Brittany) reported on their function reports that Reeves was capable of a large number of activities (Tr. 17, 22, 23); (2) that Reeves' mental-health treatment

---

[3] In January 2012, Dr. Schloesser wrote, "Depression. This continues to be uncontrolled. Unfortunately, Kelly has not improved with Prozac or Amitriptyline." (Tr. 264.) And in April 2012, Dr. Washington noted that Reeves' "mood remain[ed] depressed" and that she was still having "frequent crying spells." (Tr. 284.)

had been "somewhat minimal, generally managed by her primary care physician," with "attempts to seek increased mental health treatment . . . somewhat questionable," including that Reeves had sought out treatment prior to jury duty (Tr. 19–20); (3) that, in August 2011 (when Reeves' symptoms began to increase), Reeves "reported financial difficulties[,] . . . as she was collecting alimony from her ex-husband [before he died], and that her application for disability benefits had been recently [initially] denied" (Tr. 20); (4) that Reeves had "irregular treatment generally based on [her] financial needs" (Tr. 23); and (5) Dr. Horner's consultative opinion that Reeves' ability to focus and sustain attention was "basically intact" (Tr. 23).

None of these reasons sufficiently explain why the ALJ rejected Dr. Washington's marked limitations while adopting his lesser restrictions—at least to the extent that Dr. Washington opined on Reeves' condition after July 2011.

As for the ALJ's reliance on Reeves' and her daughter's function reports, the last of those was completed in July 2011, prior to when Reeves' condition worsened.

Regarding Reeves' treatment history, post July 2011, it cannot be fairly considered "minimal." Beginning in August 2011, Reeves tried a number of medications for her anxiety and PTSD and attempted to attend counseling. Medicine was ineffective. And the reasons Reeves failed to completely follow through with counseling were unrelated to the severity of her impairments; as her counselor noted, "Due to transportation problems Ms. Reeves was only able to attend 4 out of 7 sessions, which has left Ms. Reeve[]s significantly impaired in the area of Social and Emotional functioning. Because of her impairments this has left Ms. Reeve[]s unable to seek and maintain regular employment." (Tr. 267.)

As for the possibility that the ALJ inferred that Reeves sought increased treatment because of financial stressors (*see* Tr. 23), that too does not significantly undermine Dr.

19

Washington's finding that Reeves had "marked" limitations in her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."

To the extent that the ALJ's statement that Reeves had "irregular treatment generally based on [her] financial needs" could be interpreted to imply that Reeves' condition was not severe (*see* Tr. 23), a claimant's failure to obtain regular treatment without the finances to do so is a questionable basis for discounting the severity of the claimant's condition. *See* S.S.R. 96-7p, 1996 WL 374186, at *7 ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. *However*, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." (emphasis added)).

Finally, the ALJ credited Dr. Horner's opinion because she discounted Dr. Washington's (and Dr. Schloesser's) opinions and for the reasons just discussed. (*See* Tr. 23 ("Given such minimal mental health treatment, as well as a period of medication adjustment, and the claimant's reported activities of daily living, I find that [Dr. Horner's] opinion is consistent with the record as a whole. As such, I have assigned significant weight to the opinion of Dr. Horner.").) Thus, the foregoing suffices to explain why Dr. Horner's opinion as a basis for rejecting Dr. Washington's potentially-disabling limitations was questionable. The Court adds,

however, that Dr. Horner's opinion is ambiguous and could be read consistently with Dr. Washington's:

> [Reeves'] *ability to focus and sustain attention to relevant occupational tasks* is basically intact and operational though affected by her moods to the extent that her concentration can be diminished. The efficiency of Ms. Reeves's *ability, but not her ability as such, to withstand or otherwise cope with the stresses of ordinary occupational activity* is affected by her moods.

(Tr. 216 (emphases in original).)

In short, the ALJ apparently rejected Dr. Washington's more severe limitations—including that Reeves had a marked limitation in her ability to go through a work week without interruptions from her mental or emotional impairments—while accepting Dr. Washington's less-severe limitations that were consistent with her residual functional capacity assessment of Reeves. Yet the ALJ's targeted discussion of Dr. Washington's opinion does not tell Reeves why that was done, and even the ALJ's broader assessment of the record does not satisfactorily answer the question. As such, the Court concludes that the ALJ did not comply fully with the reasons-giving requirement of the treating-source rule. It follows that remand is warranted. *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) ("When an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))); *Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.").

21

## C.

As noted, Dr. Schloesser opined that Reeves could not work "any job" citing limitations in memory, sustained concentration, and social interaction. (Tr. 259, 261.) Reeves argues that the ALJ failed to adequately explain why she assigned the family physician's opinion only "some weight" in violation of the explanatory requirement of the treating-source rule. (Pl.'s Mot. 14–15.)

In assessing Dr. Schloesser's opinion, the ALJ recognized her "long-established treating relationship" with Reeves, but found the opinion "generally inconsistent with the record." (Tr. 22.) The ALJ explained,

> With regard to the claimant's mental impairments, I note limited medical evidence, revealing irregular treatment generally based on the claimant's financial needs, and the lack of need for more emergent psychiatric care, as well as the claimant's extensive reported activities of daily living. Moreover, I note that the issue as to whether one is disabled, or otherwise unable to work, is an issue reserved to the Commissioner, pursuant to SSR 96-5p.

(Tr. 22–23.) "As such," the ALJ concluded, "limited to the extent consistent with the findings as stated in this decision, I have assigned only some weight to the opinion of Dr. Schloesser." (Tr. 23.)

Reeves argues that the ALJ's application of S.S.R. 96-5p was error. She points out that even when a physician opines on an issue reserved to the ALJ, such as whether a claimant is disabled, the physician's opinion cannot be completely ignored. (*See* Pl.'s Mot. at 15.) The Court does not disagree with Reeves' statement of the law:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. *Such opinions on these issues must not be disregarded.*

22

However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

S.S.R. 96-5p, 1996 WL 374183, at *5 (emphasis added).

The problem with Reeves' argument, however, is not her statement of the law, but her claim that the ALJ misapplied it. The ALJ did not "disregard[]" Dr. Schloesser's opinion of disability simply because she opined on an issue reserved to the Administration. Instead, the ALJ assigned the opinion "some weight" while explaining that there was "limited medical evidence, revealing irregular treatment generally based on the claimant's financial needs, and the lack of need for more emergent psychiatric care, as well as the claimant's extensive reported activities of daily living." (Tr. 23.)

Reeves further argues that this statement does not comport with the "good reasons" requirement of the treating-source rule. (Pl.'s Mot. at 14–15.) To the extent that these reasons are a basis for discounting Dr. Schloesser's opinion of Reeves' condition after July 2011, the Court tends to agree. As explained, beginning in August 2011, Reeves' condition worsened. This was after she completed her function reports, and before Dr. Schloesser provided her opinion in January 2012. And the ALJ's statement that the record demonstrated "irregular treatment generally based on the claimant's financial needs" has been discussed: whatever the reason, it is clear that Reeves sought increased mental health treatment due to increased symptoms after July 2011.

In view of the Court's decision to remand for the ALJ to further explain how she evaluated Dr. Washington's opinion, the Court will also direct the ALJ to reconsider Dr. Schloesser's opinion in conjunction with Dr. Washington's, with special attention to their functional limitations in comparison to Reeves' post July 2011 condition.

**D.**

Finally, Reeves says that substantial evidence does not support assigning less than controlling weight to Dr. Washington's opinion. (Pl.'s Mot. at 11–13.) As the Court has decided to remand this case for the ALJ to further explain how she evaluated Dr. Washington's opinion, the Court declines to address this argument at this time.

**IV.**

For the foregoing reason the Court GRANTS Plaintiff's Motion for Summary Judgment (Dkt. 16) and DENIES the Commissioner's Motion for Summary Judgment (Dkt. 21). It follows that the Court remands this case for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). On remand, an administrative law judge shall explain more fully the weight assigned to Dr. Washington's and Dr. Schloesser's treating-source opinions consistent with this opinion and order.

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  March 20, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on March 20, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson